IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRIAN J. ERICKSON,

        Plaintiff,

vs.

MOON TOWNSHIP and GREGORY
M. SEAMON,

        Defendants.

Civil Action No. 2:22-cv-276

Judge:  Colville

**JURY TRIAL DEMANDED**

**COMPLAINT**

1.      This action arises under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301-4335, as amended ("USERRA"), and under Pennsylvania law.

**I.     Parties**

2.      Staff Sergeant Brian J. Erickson is an adult person and former police officer of the Moon Township Police Department who resides in the Western District of Pennsylvania.

3.      Defendant Moon Township is a local governmental entity and/or political subdivision organized under the laws of the Commonwealth of Pennsylvania that maintains its offices at 1000 Beaver Grade Road, Moon Township, Pennsylvania 15108.  Moon Township is an employer as defined by 38 U.S.C. § 4304(4)(A)(iii) and (14).

4.      Defendant Gregory M. Seamon is an adult person and the Chief of Police of the Moon Township Police Department who resides in the Western District of Pennsylvania. Seamon is an employer as defined by 38 U.S.C. §§ 4304(4)(A) and 4303(4)(A)(i) because he has control over the employment opportunities of Moon Township police officers and has been

delegated the performance of employment-related responsibilities regarding Moon Township

Police Officers.

5.      As the Moon Township Chief of Police, Seamon was responsible for supervising

the day-to-day operations and activities of the Police Department and had direct supervision of

the police officers in the Department.

## II.     Jurisdiction and Venue

6.      This Court has subject matter jurisdiction pursuant to 38 U.S.C. § 4323(b)(3) and

28 U.S.C. § 1367.

7.      The United States District Court for the Western District of Pennsylvania is an

appropriate venue under 38 U.S.C. § 4323(c)(2) because the Defendants are located in this

District.

## III.    Facts

### A.     Erickson enlists in the Air Force in response to 9/11

8.      Staff Sergeant Brian Erickson joined the United States Air Force at the age of 17

in response to the terrorist attacks of September 11, 2001.

9.      From the moment he enlisted and continuing to the present, the Air Force taught

Erickson its three Core Values: Integrity First, Service Before Self and Excellence In All We Do.

10.     The Air Force also taught Erickson the Airman's Creed.  The Airman's Creed

represents a "tangible statement of beliefs" and "sets the tone of life…by providing a value

structure by which [Airmen] live and work."  It "defines who [Airmen] are and what [they] stand

for…."  The Airman's Creed reads:

I am an American Airman.
I am a warrior.
I have answered my Nation's call.
I am an American Airman.
My mission is to fly, fight, and win.

> I am faithful to a proud heritage, a tradition of honor,
> and a legacy of valor.
> I am an American Airman,
> guardian of freedom and justice,
> my Nation's sword and shield,
> its sentry and avenger.
> I defend my country with my life.
> I am an American Airman:
> Wingman, Leader, Warrior.
> I will never leave an Airman behind,
> I will never falter,
> and I will not fail.

11.     In 2008, the Air Force and Air National Guard inducted Erickson as a

Noncommissioned Officer.  Erickson's Certificate of Induction reads:

> Your induction carries with it the *obligation to willingly accept
> greater responsibility* while exercising additional authority.  Your
> every action must be governed by a strong sense of personal and
> moral responsibility, leadership by example, excellence and
> commitment to Air Force standards.  *You will observe and follow
> such orders as may be given* by superiors acting according to the
> provisions of the United States Air Force and Air National Guard
> Instructions, General Orders, the Uniform Code of Military Justice,
> and supporting orders, policy, and directives. (emph. added)

12.     Erickson currently serves in the Air National Guard as a Fuels Journeyman in the

171st Air Refueling Wing, 171st Mission Support Group, 171st Logistics Readiness Squadron

based in Coraopolis, Pennsylvania.

13.     In his two decades of uniformed service, the Air Force recognized Erickson for

his "outstanding support to our Nation's safety and security in direct support of the global war on

terrorism."  It awarded him the Iraqi Campaign Medal for his service in support of Operation

Iraqi Freedom at Sather Air Base, 447th  Expeditionary Security Forces Squadron in Baghdad,

Iraq.  It awarded him the Outstanding Volunteer Service Medal for his efforts in "promoting

cultural understanding between Americans and the Iraqi people."  It also twice awarded him the

Air Force Achievement Medal and the Air Reserve Forces Meritorious Service Medal.

Pennsylvania also recognized Erickson for his service, awarding him the Pennsylvania State Service Medal and the General Thomas J. Stewart Medal.

14.     In his most recent performance review, Erickson's military superiors gave Erickson the highest possible rating of "Exceeds most, if not all expectations" in each of the three ratings areas of "Performance in Primary Duties/Training Requirements," "Fellowship/Leadership" and "Whole Airman Concept."  Among their accolades, his superiors said that Erickson is a "confident leader" and "academic achiever" who "won't compromise AF Core Values; enforced AF standards of conduct/performance, [and] sets [an] example" for others.

15.     According to the Air Force Handbook, 36-2618, 5 July 2018, Staff Sergeants like Erickson "are primarily highly skilled technicians with supervisory and training responsibilities. ***  They must continuously strive to further their development as technicians, supervisors, and leaders through professional development opportunities, including Air Force and Joint Enlisted Professional Military Education.  They are responsible for their subordinates' development and the effective accomplishment of all assigned tasks.  They must ensure proper and effective use of all resources under their control to ensure the mission is effectively and efficiently accomplished. They should consider broadening opportunities through special duties and the Development Special Duty selection process."

**B.      Moon Township hires Erickson but quickly shows hostility to his military duties**

16.     Moon Township hired Erickson as a police officer in 2017.

17.     Erickson's oral interview was conducted by Defendant Seamon (who was then a Captain), Sergeant Lonkert and Assistant Township Supervisor Jeff Ziegler.

18.     Toward the end of the interview, the panel asked Erickson questions about his commitments to the United States military, his intentions regarding his continued military service, and how much time he had left on his contract.

19.     Since his hiring, Erickson performed at or above Moon Township's expectations.

20.     From time to time, Erickson's continued service in the United States military required that he take time off from work.

21.     Defendant Seamon complained to Erickson several times about how much overtime Erickson was costing the Township when Erickson was away on military duty.

22.     At one point, Seamon asked Erickson who Seamon needed to call to get Erickson off his military orders.

23.     Seamon routinely manipulated Erickson's work schedule in a way that he did not for other police officers who did not have military duties.

24.     Erickson was part of "C" squad for purposes of the Police Department's 12-hour shift, four-week rotating schedule.  In weeks when C squad was assigned the midnight shift on Mondays, Tuesdays, Fridays, Saturdays and Sundays, if the week preceded a weekend when Erickson had to report to military duty, Seamon would switch Erickson from his midnight shift to a daylight shift on Friday to avoid paying Erickson military leave pay that day.  Seamon did not similarly manipulate the assigned schedules of other police officers who did not have military duties.

25.     Captain Ogden commented to Erickson that military service members really mess up the police schedule.

26.     Corporal Kazmierczak also made negative comments about Erickson's military duties.

### C. The United States Air Force orders Erickson to active duty

27.    Pursuant to Orders ZBW9YJ dated December 4, 2020, the United States Air Force ordered Staff Sergeant Erickson, pursuant to 10 U.S.C. § 12301(d), into federal active duty in support of Operation Noble Eagle/Homeland Defense for a period of 90 days beginning on January 1, 2021 and ending on March 31, 2021.

28.    Erickson promptly provided a copy of his December 4, 2020 Orders to Defendants.

29.    In the first numbered paragraph on the first page in all capital letters, Erickson's December 4, 2020 Orders stated:

> 1.    TYPE OF DUTY / AUTHORITY:  ACTIVE DUTY –
> VOLUNTARY CONTINGENCY (MPA) 10 U.S.C. 12301(d)

30.    Pursuant to Orders ZBW9YJ dated March 18, 2021, the United States Air Force, pursuant to 10 U.S.C. § 12301(d), continued Erickson's federal active duty in support of Operation Noble Eagle/Homeland Defense through June 30, 2021.

31.    Erickson promptly provided a copy of his March 18, 2021 Orders to Defendants.

32.    In the first numbered paragraph on the first page in all capital letters, Erickson's March 18, 2021 Orders stated:

> 1.    TYPE OF DUTY / AUTHORITY:  ACTIVE DUTY –
> VOLUNTARY CONTINGENCY (MPA) 10 U.S.C. 12301(d)

33.    Pursuant to Orders ZBW9YJ dated June 22, 2021, the United States Air Force, pursuant to 10 U.S.C. § 12301(d), continued Erickson's federal active duty in support of Operation Noble Eagle/Homeland Defense through September 30, 2021.

34.    Erickson promptly provided a copy of his June 22, 2021 Orders to Defendants.

35.     In the first numbered paragraph on the first page in all capital letters, Erickson's June 22, 2021 Orders stated:

> 1.     TYPE OF DUTY / AUTHORITY:  ACTIVE DUTY –
> VOLUNTARY CONTINGENCY (MPA) 10 U.S.C. 12301(d)

41.     Pursuant to Orders ZBW9YJ dated September 27, 2021, the United States Air Force, pursuant to 10 U.S.C. § 12301(d), continued Erickson's federal active duty in support of Operation Noble Eagle/Homeland Defense through December 31, 2021.

42.     Erickson promptly provided a copy of his September 27, 2021 Orders to Defendants.

43.     In the first numbered paragraph on the first page in all capital letters, Erickson's September 27, 2021 Orders stated:

> 1.     TYPE OF DUTY / AUTHORITY:  ACTIVE DUTY –
> VOLUNTARY CONTINGENCY (MPA) 10 U.S.C. 12301(d)

36.     Pursuant to Orders ZBW9YJ dated December 16, 2021, the United States Air Force, pursuant to 10 U.S.C. § 12301(d), continued Erickson's federal active duty in support of Operation Noble Eagle/Homeland Defense  through March 31, 2022.

37.     Erickson promptly provided a copy of his December 16, 2021 Orders to Defendants.

38.     In the first numbered paragraph on the first page in all capital letters, Erickson's December 16, 2021 Orders stated:

> 1.     TYPE OF DUTY / AUTHORITY:  ACTIVE DUTY –
> VOLUNTARY CONTINGENCY (MPA) 10 U.S.C. 12301(d)

39.     As set forth above, each set of Erickson's Orders expressly and conspicuously cited 10 U.S.C. § 12301(d), which provides in relevant part:

> At any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member.

**D.      Defendants terminate Erickson because of his military service**

40.      On or about January 11, 2022, Seamon summon Erickson to his office for a Weingarten meeting with Seamon, Captain Ogden and a union representative.

41.      The alleged purpose of the meeting, as later stated by Defendants, was to "investigate the veracity of information you provided to the Captain relative to your military service obligations.  Specifically, you led members of this Department to believe that you had been involuntarily deployed to military duty."

42.      At this meeting, Ogden fumed about the length of Erickson's deployment to active military duty and berated Erickson for accepting Orders to active military duty.

43.      Ogden then threatened to put Erickson on a "Brady List."

44.      A "Brady List" is a list of police officers accused of professional misconduct that prosecutors must disclose to criminal defendants.

45.      Seamon demanded to know whether Erickson's deployment to active military duty was "voluntary" or "involuntary."

46. Erickson responded in substance that it didn't matter; Orders were Orders.[1] He also explained that he had provided copies of each set of his Orders to the Police Department promptly upon receiving them, and that his Orders clearly reflected the nature of his active duty.

47. Less than a week later, Seamon scheduled a Loudermill hearing for Erickson to take place on or about January 18, 2022.

48. Through his union, Erickson requested the constitutionally required notice of the charges against him.

49. Seamon refused to provide Erickson or his union with a Statement of Charges. Erickson declined to attend the hearing.

50. By letter dated January 27, 2022 and authored by Seamon, Defendants terminated Erickson's employment.

51. Every reason Defendants articulated in the termination letter directly related to Erickson's service in the United States military.

---

[1] Erickson was correct. USERRA draws no distinction between "involuntary" and "voluntary" military service. *See*, 38 U.S.C. § 4303(13) (Defining "service in the uniformed services" as "the performance of duty on a voluntary or involuntary basis in a uniformed service…"); 38 U.S.C. § 4301(a)(1) (Purpose of USERRA is to "encourage non-career service in the uniformed services"); 38 U.S.C. § 4311 (Prohibiting employment discrimination against "a person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service"). *See also, Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 533 (S.D.N.Y. 2017) ("[W]hether Plaintiff was volunteering for duty … or being ordered to appear is a distinction without a difference. The fact that Plaintiff volunteered for, or voluntarily accepted military orders, is of no import in finding liability under USERRA, because whether or not [Plaintiff's] orders were voluntary, firing a reservist because he or she receives military orders violates the plain language of [§] 4311."); *Pfunk v. Cohere Communs., LLC*, 73 F. Supp. 3d 175, 190 (S.D.N.Y. 2014) (same); *Lapine v. Town of Wellesley*, 970 F. Supp. 55, 59 n.5 (D. Mass. 1997) ("An order to active duty is received whether or not a person enters on active duty in the Armed Forces voluntarily or involuntarily. Further, § 4304(b)(1) applies to any Reserve member "who enters upon active duty…whether or not voluntarily…").

52.     In particular, Defendants falsely accused Erickson of dishonesty, insubordination and conduct unbecoming an officer, based on Erickson's alleged failure to disclose the nature of his Orders, and his alleged refusal to answer questions about whether his military deployment was "voluntary" or "involuntary."  These false reasons were all pretexts for terminating Erickson because of his service in the uniformed services.

53.     The same day Defendants fired Erickson, Seamon sent an email to "All staff" announcing that Erickson had been terminated and was banned from the Police Department unless accompanied by an escort.

54.     Seamon was the decisionmaker on Erickson's termination.

55.     In the event Seamon was not the final decisionmaker, then Seamon caused Erickson's termination when, acting with antimilitary animus and intending to cause Erickson's termination, he solicited approval to terminate Erickson from the Township Manager and the Board of Supervisors, who in turn authorized Seamon to terminate Erickson based on the information Seamon provided.

**E.     The Township discriminates against another police officer with military duties**

56.     Moon Township police officer Shannon Noonan joined the Air National Guard in the Fall of 2021 and so notified her superiors at the Police Department.

57.     Pursuant to Orders ZCQUUE dated December 7, 2021, and Orders ZCS7TF dated January 7, 2022, the National Guard ordered Noonan to Attendance of Formal Training School from February 22, 2022 through April 7, 2022, and to Mission Essential Skills Training from April 19, 2022 through May 19, 2022.

58.     On or about January 11, 2022, Seamon summoned Noonan to a meeting.  At this meeting, Seamon berated Noonan for joining the Air National Guard, telling her that she could either quit her job as a police officer or she would be fired.

59.     Seamon also threatened not to complete paperwork that Noonan required for her security clearance to serve in the Air National Guard.

60.     Later that day, Noonan sent Seamon an email stating that she would not resign.

61.     Noonan delivered copies of her Orders to her superiors at the Moon Township Police Department on February 1, 2022.

62.     The next day, Defendants summoned Noonan to a Loudermill hearing.

63.     Seamon said that joining the National Guard was "secondary employment" and berated Noonan for not seeking his permission before she joined the National Guard.

64.     On or about February 3, 2022, Defendants suspended Noonan's employment as a police officer.

65.     On February 8, 2022, Defendants terminated Noonan's employment as a police officer because she joined the National Guard without "following the appropriate protocol."

66.     As a matter of law, Moon Township cannot dictate the "appropriate protocol" to join the National Guard.  Noonan neither needed Moon Township's permission to join the National Guard, 20 C.F.R. § 1002.87, nor did she need to accommodate the Township's concerns regarding the timing, frequency or duration of her uniformed service. 20 C.F.R. § 1002.104.

**Count I – USERRA**
**38 U.S.C. § 4311**
**Discrimination in Termination**

67.     Erickson incorporates the allegations above into this Count as though set forth in full and asserts this Count against Defendants Moon Township and Seamon.

68.    Defendants terminated Erickson because of his service in the United States military.

69.    Defendants' actions were willful.

70.    As the direct result of Defendants' discrimination, Erickson has suffered damages.

WHEREFORE, under this Count, Erickson demands:

a.    Back pay and benefits,

b.    Front pay and benefits,

c.    Damages for loss of earnings capacity;

d.    Pre- and post-judgment interest,

e.    Liquidated damages,

f.    An upward adjustment for adverse tax consequences;

g.    Attorney fees and costs of suit, and,

h.    Such other legal and equitable relief as the Court finds just and proper.

## Count II – Pennsylvania Military Affairs Act
### 51 Pa.C.S.C. § 7309

71.    Erickson incorporates the allegations above into this Count as though set forth in full and asserts this Count against Defendants Moon Township and Seamon.

72.    Defendants terminated Erickson because of his service in the United States military.

73.    Defendants' actions were willful.

74.    As the direct result of Defendants' discrimination, Erickson has suffered damages.

WHEREFORE, under this Count, Erickson demands:

a.    Back pay and benefits,

b.    Front pay and benefits,

c.      Damages for loss of earnings capacity;

d.      Pre- and post-judgment interest,

e.      Liquidated damages,

f.      Compensatory damages,

g.      An upward adjustment for adverse tax consequences;

h.      Attorney fees and costs of suit, and,

i.      Such other legal and equitable relief as the Court finds just and proper.

**Count III – Common Law**
**Wrongful Termination**

75.      Erickson incorporates the allegations above into this Count as though set forth in full and asserts this Count against Defendant Moon Township.

76.      The Pennsylvania Military Affairs Act ("PMAA") expresses the clear and specific Pennsylvania public policy against employment discrimination because of service in the uniformed services:

> (a) General rule.—It is unlawful for the Commonwealth or … any
> political subdivision, or for any private employer, to refuse to hire
> or employ any individual not on extended active duty because of
> his membership in the National Guard or any one of the other
> reserve components of the armed forces of the United States …, or
> because he is called or ordered to active duty by the Federal
> Government under provisions of 10 U.S.C. (relating to armed
> forces) or 32 U.S.C. (relating to National Guard), or to discharge
> from employment such individual, or to otherwise discriminate
> against such individual with respect to compensation, hire, tenure,
> terms, conditions or privileges of employment because of such
> membership, or because he is called or ordered … to other military
> duty authorized by law.

51 Pa. C.S.A. § 7309(a) (emphasis added).

77.      "Maintaining the readiness and efficiency of our National Guard and ensuring the job security of its members is an important public policy canonized in [Pennsylvania] statutory

and constitutional provisions." *Tukesbrey v. Midwest Transit, Inc*., 822 F. Supp. 1192, 1201 (W. D. Pa. 1993) citing 51 Pa. C.S.A. § 1101 *et seq*. and § 7301 *et seq*.

78.     Defendant's termination of Erickson was wrongful under Pennsylvania law because it violated the Pennsylvania public policy embodied in the PMAA.   *See*, *Hamovitz v. Santa Barbara Applied Research, Inc.*, No. 2: 07-cv-0454, 2010 U.S. Dist. LEXIS 110937, at *19 (W.D. Pa. Oct. 19, 2010) (finding that refusal to hire service member in violation of PMAA gives rise to common law tort claim with full tort remedies including compensatory and punitive damages); *Stadtmiller v. UPMC Health Plan, Inc.*, 2010 U.S. Dist. LEXIS 155550 *6-7 (W.D.Pa. 2010) (permitting common law wrongful discharge claim based on the PMAA).

79.      Defendant's termination of Erickson because of his military service obligations was reckless and/or malicious.

80.     As the direct and proximate result of Defendant's termination of Erickson, Erickson has sustained damages.

WHEREFORE, Erickson demands and judgment in his favor for:

a.      Back pay and benefits,

b.      Front pay and benefits,

c.      Damages for loss of earnings capacity;

d.      Pre- and post-judgment interest,

e.      Compensatory damages,

f.      An upward adjustment for adverse tax consequences, and,

g.      Such other legal and equitable relief as the Court finds just and proper.

## Count IV – Personal Participation
## Pennsylvania Common Law

81.     Erickson incorporates the allegations above into this Count as though set forth in full and asserts this Count against Defendant Seamon.

82.     Under Pennsylvania law, an employee acting within the scope of his or her employment is liable for torts committed by his employer in which he personally participates. *See, Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 470 A.2d 86, 90 (Pa. 1983).

83.     Seamon engaged in misfeasance and personally participated in Moon Township's wrongful discharge of Erickson by discriminating against Erickson because of his military service and duties, and terminating or causing the termination of Erickson's employment because of his military service and duties.

84.     Seamon's conduct was reckless and/or malicious.

85.     As the direct and proximate result of Seamon's conduct, Erickson has sustained damages.

WHEREFORE, Erickson demands judgment in his favor for:

a.     Back pay and benefits,

b.     Front pay and benefits,

c.     Damages for loss of earnings capacity;

d.     Pre- and post-judgment interest,

e.     Compensatory damages,

f.     Punitive damages,

g.     An upward adjustment for adverse tax consequences, and,

h.     Such other legal and equitable relief as the Court finds just and proper.

**Count V – Aiding and Abetting**
**Restatement (Second) of Torts § 876**

86.     Erickson incorporates the allegations above into this Count as though set forth in full and asserts this Count against Defendant Seamon.

87.     At all times material to this Complaint, Seamon knew that Moon Township's termination of Erickson because of his military service and duties was unlawful under USERRA and the PMAA, yet he gave substantial assistance and/or encouragement to Moon Township in terminating Erickson's employment for this unlawful reason.

88.     Seamon substantially assisted Moon Township in tortiously terminating Erickson's employment and Seamon's own conduct, separately considered, constituted a breach of Seamon's duty not to discriminate against Erickson because of his military service and duties.

89.     Seamon's conduct was reckless and/or malicious.

90.     As the direct and proximate result of Seamon's conduct, Erickson has sustained damages.

WHEREFORE, Erickson demands judgment in his favor for:

a.      Back pay and benefits,

b.      Front pay and benefits,

c.      Damages for loss of earnings capacity;

d.      Pre- and post-judgment interest,

e.      Compensatory damages,

f.      Punitive damages,

g.      An upward adjustment for adverse tax consequences, and,

h.      Such other legal and equitable relief as the Court finds just and proper.

## Count VI – Wage Payment and Collection Law
### 43 P.S. § 260.1 et seq.

91.     Erickson incorporates the allegations above into this Count as though set forth in full and asserts this Count against Defendant Moon Township.

92.     Defendants terminated Erickson's employment prior to the vesting of his pension. As a result, Erickson became ineligible to receive a pension.

93.     § 7:14 of the applicable Collective Bargaining Agreement between Moon Township and the Moon Township Police Officers provides:

> Any member of the Police Force who, for any reason whatsoever, shall be ineligible to receive a pension after having contributed to the Police Pension Fund, shall be entitled to a refund of all such monies paid by him into such fund, plus all interest earned by such monies while in the Police Pension Fund as determined by the Township immediately upon discontinuance of his employment with the Police Force.  If such discontinuance is due to death, such monies shall be paid to his designated beneficiary, or in the absence thereof, to his estate.

94.     Since being hired in 2017, Erickson contributed money to the Police Pension Fund.

95.     Notwithstanding his termination from employment, and notwithstanding his demand for a refund, the Township has failed and refused to refund the monies Erickson contributed to the Police Pension Fund.

96.     The Township's failure and refusal to refund Erickson the monies he contributed to the Fund with interest is willful and lacking in any good faith basis.

97.     The Township's failure and refusal to refund Erickson the monies he contributed to the Fund with interest is retaliation for his assertion of rights under USERRA and the PMAA.

98.     As the direct result of the Township's conduct, Erickson has sustained damages.

WHEREFORE, Erickson demands judgment in his favor for:

     a.       All wages, fringe benefits and wage supplements due and owing,

     b.       Liquidated damages,

     c.       Attorney fees and costs of suit, and

     d.       Such other legal and equitable relief as the Court finds just and proper.

Respectfully submitted,

_____
Charles A. Lamberton, Esq.
Pa. I.D. No. 78043
cal@brackenlamberton.com
Robert A. Bracken, Esq.
Pa. I.D. No. 206095
rab@brackenlamberton.com
Bracken Lamberton, LLC
707 Grant Street
Gulf Tower, Suite 1705
Pittsburgh, PA  15219
412-258-2250
www.brackenlamberton.com

18